**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


RAMONA BUSTAMANTE (AVITIA),
**Individually and As Personal Representative**
**of the Estate of LUIS ABITIA a/k/a LUIS AVITIA,**

      Plaintiff,

vs.                                                                    Civ. No. 08-315 JP/WPL

BOARD OF COUNTY COMMISSIONERS OF
SAN MIGUEL COUNTY, JOHN DOES
I through V, and JANE DOES I through V,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On August 24, 2009, the Court held a bench trial to decide the sole remaining

claim in this case: Plaintiff Ramona Bustamante's claim, both individually and as

representative of the Estate of Luis Avitia, against Defendant Board of County

Commissioners of San Miguel County ("Board") under the New Mexico Tort Claims Act.

Present for trial were James Lyle and Nancy Richards, counsel for Plaintiff Ramona

Bustamante, and Michael Dickman, counsel for Defendant Board.

Before beginning the presentation of evidence,[1] the Court heard argument on

Defendant's Motion in Limine (Doc. No. 68), which sought to limit the scope of

allowable testimony by two expert witnesses, Dr. Thomas L. Gross, M.D. and Dr. Ian

Paul M.D. After hearing argument and considering the applicable law, the Court

granted Defendant's Motion in Limine for the reasons set forth below. Following the

---

[1] Although testimony by witnesses in court had not begun, the Court had read the
deposition testimony of Akeen Birdow and Patrick Daniel Maes and considered their trial
deposition testimony as part of the trial evidence.

Court's ruling on Defendant's Motion in Limine, Plaintiff's counsel informed the Court that Plaintiff no longer had evidence to support the causation element of her remaining claim.

Despite Plaintiff's concession regarding inability to prove the causation element underlying her remaining claim against the Board, the Court sought to clarify the precise nature of Plaintiff's remaining claim and her theory of liability.  During this discussion, the Court learned that Plaintiff sought to hold the Board vicariously liable for the decedent's death under both NMSA 1978 §§ 41-4-6 and -12.  As set forth below, the Court found that under either theory of liability, Plaintiff could not establish a viable claim against the Board.

Therefore, in light of Plaintiff's concession regarding a lack of evidence establishing that actions or omissions by unnamed members of the San Miguel County Detention Center staff caused Mr. Avitia's death, and because the Court determined that under the applicable law Plaintiff could not prevail in her remaining claim against the Board even with evidence establishing causation, the Court finds that judgment should be entered in favor of Defendant Board and Plaintiff's remaining claims against the Board should be dismissed with prejudice.

## BACKGROUND

I.   **Factual Background**

On March 25, 2006, New Mexico State Police Officer Steve Montano responded to a call regarding a single vehicle accident in Serafina, New Mexico.  Upon arrival at the accident scene, Officer Montano encountered the decedent, Luis Avitia, sitting outside of his vehicle. Officer Montano noticed that Avitia appeared intoxicated.  After

attempting to administer field sobriety tests, which Avitia was unable to perform due to his level of intoxication, Officer Montano arrested Avitia for suspicion of driving while under the influence of intoxicating liquor or drugs.  After arresting Avitia, Officer Montano called an ambulance to transport Avitia to Alta Vista Regional Hospital in Las Vegas, New Mexico for medical evaluation to determine whether Avitia could be safely incarcerated.  (Mot. Summ. J. Liability Exs. A, B)(Doc. No. 38.)  Although Dr. Gwen Teekel ultimately signed a medical clearance for Avitia, Officer Montano claimed in his deposition that Dr. Teekel never actually examined or even visited with Avitia.  (*Id.*, Exs. B, C.)

Following Avitia's discharge from Alta Vista Regional Hospital, Officer Montano transported Avitia to the San Miguel County Detention Center ("SMCDC").  (*Id.*, Ex. B.) Avitia arrived at SMCDC shortly after 8:00 p.m. on March 25, 2006. (Pl.'s Trial Ex. 4-1.)[2]  Due to Avitia's level of intoxication when he arrived at SMCDC, jail staff placed Avitia in an intoxication cell, "Intox-4," to allow him time to become sober before he went through the booking process.  (*Id.*, Exs. 4-2, 4-4.)  It was not until the following day that Avitia was able to complete that process.

At 12:30 p.m. on March 26, 2006, Avitia, as part of the booking process, underwent a medical assessment from SMCDC Medical Officer Judy Herzog.  (*Id.*, Ex. 4-2.)  Medical Officer Herzog noted the medical clearance from Alta Vista Regional Hospital and did not list any concerns or  abnormalities on the medical intake form.

---

[2] The Court admitted into evidence on the date of trial Plaintiff's Exhibits 1-5 and Defendant's Exhibits 4 and 10 for the limited purpose of determining the viability of Bustamante's remaining claims under NMSA 1978 §§ 41-4-6 and -12.  Accordingly, those exhibits will be considered part of the record for purposes of this opinion.

(*Id.*, Ex. 2-1.)  Consequently, Medical Officer Herzog cleared Avitia for placement in general population.  (*Id.*, Exs. 2-3.)

Despite receiving clearance to place Avitia in general population, SMCDC staff never did so, instead electing to place Avitia in Holding Cell 4, a multi-occupant holding cell in the booking area of the SMCDC.  (Mot. Summ. J. Liability Ex. B.)  Shortly after 5:00 p.m., SMCDC staff began distributing dinner trays to the inmates in their cells. (Pl.'s Trial Ex. 4-2.)  Under SMCDC policy, inmates were required to take their own tray from the food port at the front of the cell when called to do so.  Avitia did not respond when called to take his tray.  Consequently, SMCDC Officer Valencia entered Avitia's cell to determine why Avitia was not responding and found Avitia gray in appearance and cold to the touch.  SMCDC staff then called for an ambulance and attempted to resuscitate Avitia. (Mot. Summ. J. Liability Ex. B.)  However, despite the efforts of SMCDC staff and paramedics, Avitia died at the SMCDC shortly before 6:00 p.m. on March 26, 2006. (*Id.*; Pl.'s Trial Ex. 4-2.)  After an autopsy, the Office of the Medical Investigator at the University of New Mexico concluded that Avitia died from multiple blunt force injuries sustained in his automobile accident.  (Pl.'s Trial Ex. 5-6.)

## II.    **Procedural Background**

Following Avitia's death, Plaintiff Ramona Bustamante sought appointment as the personal representative of Avitia's estate.  Bustamante indicated she was "the surviving spouse" of Avitia, that she had "looked carefully and thoroughly for a will" and had found none, and that she had "carefully searched" for children and other heirs of Avitia and had found none. Bustamante signed the application as "Ramona Bustamante Avitia." The probate court of San Miguel County appointed Bustamante personal

4

representative of Avitia's estate. (Mot. Summ. J. Standing, Ex. F)(Doc. No. 38.)

On January 22, 2007, Bustamante filed a complaint in this Court against the Alta Vista Regional Hospital for violations of the Emergency Medical Treatment and Active Labor Act. (Civ. No. 07-77, U.S. Dist. Ct., D.N.M., Doc. No. 1.) Four days later, she filed a wrongful death action in state district court against Dr. Teekel for negligently failing to evaluate Avitia's condition. (Mot. Summ. J. Standing, Ex. I.) After adding four medical service entities to the two actions, both actions were resolved by a single settlement. (*Id.,* Ex. J.)

On March 25, 2008, three weeks before she moved for dismissal in her first federal action, Civ. No. 07-77, Bustamante filed her complaint in this case, bringing claims under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act ("NMTCA"), both individually and as personal representative of Avitia's estate, alleging that the Board and unnamed defendants were liable for Avitia's death while he was incarcerated in the San Miguel County Detention Center. (Compl. at 1.) Bustamante named as defendants the Board of County Commissioners of San Miguel County ("Board"), five John Does, and five Jane Does. (Compl. at 1.) The John and Jane Does, identified as "agents and employees of the San Miguel County Detention Center," were sued in both their individual and official capacities. (*Id.* ¶ 3.) However, Bustamante never served the actual persons represented by the John and Jane Doe Defendants and never timely amended or timely moved to amend her complaint to reflect their real names.

In her Complaint, Bustamante advanced two alternate theories concerning the circumstances of Avitia's death.  (*Id.* ¶¶ 16-18.)  Bustamante first alleged that the John and Jane Doe Defendants were deliberately indifferent to Avitia's medical needs by

failing to check on his medical condition despite requests by other inmates to do so. (*Id.* ¶¶ 16-17.) Alternatively, Bustamante claimed Avitia was beaten to death by other inmates and that the John and Jane Doe Defendants' deliberate indifference allowed that beating to occur. (*Id.* ¶ 18.)  Under either theory though, Bustamante alleged that the John and Jane Doe Defendants violated Avitia's rights under the Eighth and Fourteenth Amendments to the United States Constitution.  (*Id.* ¶¶ 16,19.) Furthermore, in that vein, Bustamante asserted a supervisory liability claim against the Board under 42 U.S.C. § 1983 and sought to hold the Board liable under the NMTCA for the conduct of the John and Jane Doe Defendants and for its allegedly negligent operation and maintenance of the SMCDC.  (*See* Compl. ¶¶ 17-18, 22.)[3]  It is important to note, however, that Bustamante did not allege violation of Avitia's rights under the New Mexico Constitution or any particular New Mexico statute.  (*See generally* Compl.)[4]

On May 29, 2009, the Board filed Defendant's Motion for Summary Judgment (Liability Issues) (Doc. No. 37). On the same day, the Board filed Defendant's Motion for Summary Judgment (Based on Plaintiff's Standing) (Doc. No. 38).  On June 25, 2009, Bustamante filed her Motion to Substitute John and Jane Doe Defendants (Doc. No. 44). At a pretrial conference on July 30, 2009, the parties argued their motions.

---

[3] Bustamante's precise theory of liability under the NMTCA was not entirely clear from the language of her Complaint nor did it become clear until the Court sought clarification on the nature of her NMTCA claims on the day of trial.  These claims will be discussed in greater detail in the discussion to follow.

[4] Although Bustamante did claim that the Board and John and Jane Doe Defendants violated the NMTCA, the plain language of the NMTCA indicates that it is an enabling statute and does not itself confer a cause of action.  *See* NMSA 1978 §§ 41-4-1 through -29.

Additionally, at that pretrial conference, the Court granted leave to the parties to brief the issue of whether the Board could be held vicariously liable under the NMTCA for the alleged deprivation of Avitia's Eighth and Fourteenth Amendment rights by law enforcement officers at the SMCDC.

On August 3, 2009, the Court issued a Memorandum Opinion and Order (Doc. No. 51) denying Bustamante's Motion to Substitute John and Jane Doe Defendants, dismissing without prejudice all of Bustamante's claims against the unnamed defendants, and dismissing with prejudice Bustamante's claims under § 1983 both in her individual capacity and as representative of Avitia's estate.  Those dispositions left Bustamante with one remaining claim, her vicarious liability claim against the Board under the NMTCA.  The Court reserved ruling on that claim pending receipt of the parties' supplemental briefs and the anticipated presentation of evidence.

On August 10, 2009, the Board filed its Supplemental Brief Regarding Count II of the Complaint ("Supplemental Brief")(Doc. No. 57).  On August 21, 2009, Bustamante filed her Trial Brief (Doc. No. 67), which addressed the issue of whether the Board could be held vicariously liable under the NMTCA for the alleged deprivation of Avitia's Eighth and Fourteenth Amendment rights, although it did not appear to respond directly to the Board's arguments in its supplemental brief.  Finally, on August 22, 2009, two days before the beginning of trial, the Board filed Defendant's Motion in Limine (Doc. No. 68), which sought to limit the scope of allowable testimony by two expert witnesses, Dr. Thomas L. Gross, M.D. and Dr. Ian Paul M.D.  Because the Board filed this motion two days before the start of trial, Bustamante did not respond in writing.

As the above discussion reveals, this case evolved into somewhat of a procedural tangle.  Therefore, while the Court has already ruled on all but one of Bustamante's claims in its Memorandum Opinion and Order (Doc. No. 51), the Court finds it necessary to develop those earlier rulings to provide a proper understanding of its later findings and its final disposition at trial of Bustamante's remaining claim.  Accordingly, the Court will first discuss in greater detail its earlier rulings on Bustamante's Motion to Substitute John and Jane Doe Defendants and the Board's Motion for Summary Judgment (Standing).  The discussion will then turn to an explanation of the Court's ruling on Defendant's Motion in Limine. analysis of Bustamante's NMTCA claims against the Board.  Finally, the discussion will conclude with an analysis of Bustamante's NMTCA claims against the Board.

## DISCUSSION

## I.    <u>Plaintiff's Motion to Substitute John and Jane Doe Defendants</u>

On June 25, 2009, Bustamante moved to substitute four named officers or employees of the SMCDC–the warden, a shift supervisor, a nurse, and a detention officer–for the John and Jane Doe defendants.[5]  In support of her motion, Bustamante stated that the Board's Motion for Summary Judgment (Liability Issues) (Doc. No. 37) "recently ... identifie[d] the [] individual Defendants who were present and on duty" at the time of Avitia's death. (Doc. No. 44 at 1; *see also* Doc. No. 43 at 1 n.1 ("Contemporaneously with this Motion, Plaintiff is filing a Motion to substitute the names of the detention officers who are now known for the John and Jane Doe

---

[5] The deadline for filing motions was June 1, 2009.  (Doc. No. 8 at 2.)

Defendants.")).  Bustamante also claimed that, "This Court routinely allows substitution of fictitious defendants after the close of discovery," (Doc. No. 50 at 1), relying on *Garcia v. City of Albuquerque*, Civ. No. 08-144 (D.N.M. 2008) as support for that proposition.[6] Lastly, Bustamante argued that none of the individuals whom she proposed to substitute would be prejudiced by their substitution into the lawsuit because the individuals and their counsel were aware of their roles and could have expected to testify at trial.

In response, the Board raised three primary arguments.  First, the Board disputed Bustamante's representation regarding the recent discovery of the individual defendants' identities.  The Board noted that in Bustamante's previously filed actions Bustamante twice subpoenaed the warden of the jail and observed that Bustamante listed, by their actual names, the shift supervisor, nurse, and detention officer as potential witnesses in the joint status report filed on October 1, 2008 (Doc. No. 6 at 6-8).  Second, the Board argued that Bustamante's motion was untimely, noting that the deadline for filing pretrial motions had long passed by the time Bustamante filed her Motion to Substitute John and Jane Doe Defendants.  Finally, the Board pointed out that the named individuals had never been served and contended that the Court therefore lacked jurisdiction over them.

-----

[6] Bustamante's reliance on *Garcia v. City of Albuquerque*, Civ. No. 08-144 (D.N.M. 2008) is misplaced.  In fact, *Garcia* provides no support for her motion as the facts of that case are materially different in two vital respects: 1) by filing an answer, (Civ. No. 08-144, Doc. No. 4), the defendants in *Garcia* waived any objection to failure to serve process, Fed. R. Civ. P. 12(h)(1)(B); and 2) by failing to respond to the motion to substitute, the defendants in *Garcia* waived any objection to the substitution (Civ. No. 08-144, Doc. No. 33 at 2).   Here, the Board is the only defendant to have filed an answer, and the Board responded–vigorously–to the motion.  Thus, *Garcia* is neither applicable nor instructive in this case.

The United States Court of Appeals for the Tenth Circuit has "generally recognized the ability of a plaintiff to use unnamed defendants so long as the plaintiff provides an adequate description of some kind which is sufficient to identify the person involved so process eventually can be served." *Roper v. Grayson*, 81 F.3d 124, 126 (10th Cir. 1996). However, the ability to use unnamed defendants at the initiation of a case does not relieve a plaintiff from complying with other provisions of the Federal Rules of Civil Procedure. *Cf. Scott v. Hern*, 216 F.3d 897, 911-12 (10th Cir. 2000)(applying Fed. R. Civ. P. 4(m) to the analysis of dismissal without prejudice of John and Jane Doe defendants)). Particularly relevant in this case is Fed. R. Civ. P. 4(m), which requires that a defendant be served within 120 days after the complaint is filed. Under Rule 4(m),

> the court must dismiss the action without prejudice against [the unnamed] defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

In *Espinoza v. United States*, 52 F.3d 838 (10th Cir. 1995), the Tenth Circuit established the analytical framework for determining whether to dismiss a complaint for failure to effect service under Rule 4(m), explaining that the Court must first determine whether the plaintiff has shown good cause for failure to effect service timely, and second, if the plaintiff fails to show good cause, the Court in its discretion must consider whether a permissive extension is warranted under the circumstances. *Id.* at 841.

The Tenth Circuit has advised that 'good cause' should be construed narrowly "to protect only those plaintiffs who have been meticulous in their efforts to comply with the Rule." *Despain v. Salt Lake Area Metro Gang Unit*, 13 F.3d 1436, 1438 (10th Cir.

1994)(interpreting an earlier version of Rule 4(m)).  Specifically, "inadvertence, neglect, negligence, mistake of counsel, ignorance of the rules, and unexplained assertions of miscalculation" has since been rejected as "good cause for untimely service." *Zamora v. City of Belen*, 2004 WL 3426121 * 2 (D.N.M.)(unpublished)(citing *Broitman v. Kirkland*, 86 F.3d 172, 174-76 (10th Cir. 1996); *Lopez v. United States*, 129 F. Supp. 2d 1284, 1295 (D.N.M. 2000)).

In this case, the Court initially notes that the situation presented falls within the scope of Rule 4(m) as more than 120 days had passed since Bustamante filed her Complaint at the time she filed her Motion to Substitute John and Jane Doe Defendants. As such, Rule 4(m) allows dismissal without prejudice of the unnamed defendants absent a showing of good cause for the delay in serving and substituting the actual individual defendants.  Bustamante wholly failed to make such a showing.

As the Board noted in its response, Bustamante missed several relevant deadlines leading up to her final, untimely attempt to substitute the four officers or employees of the SMCDC for the John and Jane Doe Defendants.  Bustamante was allowed until December 5, 2008 to amend her complaint and to join additional parties, which she did not do. (Doc. No. 6 at 2.) Discovery was to be complete by May 8, 2009 and pretrial motions were to be filed by June 1, 2009, meaning that Bustamante would have had more than three weeks after the completion of discovery to file her motion to substitute and serve the actual individual defendants. (Doc. No. 8 at 2.)  The Court also notes that the names of each of the individuals Bustamante sought to substitute appeared in the Joint Status Report and Provisional Discovery Plan filed on October 27, 2008 (Doc. No. 8 at 5-11).  It therefore strains credulity to believe Bustamante's implicit assertion in her

motion that she could not have identified those individuals before the Board filed its motions for summary judgment. Thus, the Court finds that Bustamante has not shown good cause for her failure to substitute and serve the actual individual defendants. Likewise, the Court, in its discretion, holds that nothing in the record suggests a permissive extension would have been proper in this case.  Therefore, in accordance with Rule 4(m), the claims against the John and Jane Doe Defendants had to be dismissed without prejudice, and the Court did so in the Memorandum Opinion and Order (Doc. No. 51) filed on August 3, 2009.[7]

## II.   <u>Defendant's Motion for Summary Judgment (Plaintiff's Standing)</u>

The Board moved for summary judgment on all of Bustamante's claims against it based on alleged lack of standing.  In its motion, the Board disputed the validity of Bustamante's appointment as personal representative of Avitia's estate and contended that, as a purportedly invalid personal representative, Bustamante lacked Article III standing to bring her claims. In response, Bustamante observed that New Mexico law distinguishes between the personal representative of an estate and the personal representative for wrongful death actions, *In re Estate of Sumler*, 2003-NMCA-030, ¶ 8, 133 N.M. 319, 62 P.3d 776, and argued that "New Mexico does not require that a personal representative for purposes of bringing a wrongful death lawsuit have any familial relationship with the decedent." (Resp. at 4)(Doc. No. 42.)  Thus, even though

---

[7] The Court notes that if there were named defendants entitled to summary judgment with whom the unnamed defendants could be equated, then it would be possible to grant summary judgment to the unnamed defendants as well. *See Roper v. Grayson*, 81 F.3d 124, 126 (10th Cir. 1996). However, there are no such named defendants here. Accordingly, the Court concluded that dismissal without prejudice of the unnamed defendants was the only appropriate disposition in this case.

Bustamante conceded that "she was never legally married to Mr. Avitia and did not satisfy Colorado law requirements for common law marriage," (Resp. at 2-3) she contended that her marital status with Avitia did not bear on her ability to serve as personal representative in this case.

Article III standing is a threshold issue the Court must address. *Green v. Haskell County Bd. of Comm'rs*, 568 F.3d 784, 792 (10th Cir. 2009). When an action is brought on behalf of an estate, Article III standing depends on the existence of a live controversy between the estate itself and the defendants. *See Hopkins v. Okla. Pub. Employees Ret. Sys.*, 150 F.3d 1155, 1159 (10th Cir. 1998). For the purposes of Article III standing, the putative representative of the estate is "only nominally a party," and thus whether that individual is validly the representative of the deceased's estate is not relevant to the Court's Article III standing analysis. *See id.*, 150 F.3d at 1159 n. 4. It is indisputable that a controversy exists between Avitia's estate and the Board (*see generally* Compl.), meaning that the basic requirement for Article III standing is present in this case.

However, establishing Article III standing does not necessarily mean that a claim is properly brought. For purposes of § 1983, when a person dies as a result of violations of his civil rights, only the administrator or representative of the decedent's estate may bring a § 1983 claim on the decedent's behalf. *See Berry v. City of Muskogee*, 900 F.2d 1499, 1506-07 (10th Cir. 1990). Thus, implicit in that rule is the principle that one must actually be the administrator or representative of the estate to bring such a claim.

When the validity of the personal representative's appointment is at issue, the Court finds itself in a somewhat precarious position. On the one hand, the Court must be satisfied that the person bringing a § 1983 claim on the decedent's behalf is in fact the

administrator or representative of the estate to ensure compliance with basic procedural requirements.  On the other hand, by second-guessing the validity of the representative's appointment, the Court may stretch the limits of its jurisdiction by venturing into matters traditionally left to the state courts. *See Marshall v. Marshall*, 547 U.S. 293, 311-12 (2006)(discussing the probate exception to federal jurisdiction and holding that "the probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate*).  Fortunately in this case the Court will not have to grapple with that procedural dilemma.  As Bustamante has conceded she is not validly the personal representative of Avitia's estate (*see* Resp. to Mot. Summ. J. Standing at 2), she lacks a cause of action under § 1983 against the Board and the John and Jane Does. The § 1983 claims should be dismissed with prejudice on that basis.

The Court notes that the parties largely argued past each other on this issue.  The Board's arguments pertained only to Bustamante's  § 1983 claim while Bustamante's arguments related only to the NMTCA claims, which must be brought by the wrongful death personal representative, *see Chavez v. Regents of Univ. Of New Mexico*, 103 N.M. 606, 608-09, 711 P.2d 883, 885-86 (1985). As the Board has not challenged Bustamante's ability to serve as the wrongful death personal representative in this case for purposes of bringing claims under the NMTCA, the Court will assume, without deciding, that Bustamante may properly serve in that capacity.

### III.   Defendant's Motion in Limine

Through its motion in limine, the Board sought to limit the scope of allowable testimony by two expert witnesses, Dr. Thomas L. Gross, M.D. and Dr. Ian Paul M.D. Interestingly, the Board had disclosed Dr. Gross and Dr. Paul as its own expert witnesses.  As an added twist, Dr. Gross' report disclosed during discovery had in fact been prepared for Bustamante's counsel in connection with Bustamante's medical malpractice case against Alta Vista Regional Hospital and Dr. Teekel, but the Board retained Dr. Gross for this case ostensibly to provide the same opinion.  (*See* Def. Trial Ex. 10.)   However, the Board suspected that Bustamante would attempt to elicit testimony beyond the scope of the expert reports disclosed during discovery and accordingly sought to limit the scope of Dr. Gross' and Dr. Paul's testimony to the contents of their respective reports.

As previously noted, because the Board did not file its motion until two days before the start of trial, Bustamante did not respond to the motion in writing. Therefore, at the start of trial before beginning the presentation of testimony, the Court sought clarification from Bustamante's counsel, Mr. Lyle, regarding the scope of the testimony he sought to elicit from Dr. Gross and Dr. Paul.[8]  Mr. Lyle stated that "[t]he only reason, really, we're calling Dr. Gross . . . is because the defendants do not want to stipulate that Mr. Avitia's injuries were survivable. Dr. Gross' opinion has always been, it is no surprise to anybody, that up until the time he arrests that he can be saved.  That's the

---

[8] While the Board's motion addressed both Dr. Gross and Dr. Paul, the discussion by both parties on the morning of trial focused on the proposed testimony of Dr. Gross. The discussion here will proceed accordingly.

only reason we're calling him." (Trial Tr. at 6-7.) Mr. Lyle further explained that "[t]he

only reason that I'm calling [Dr. Gross] goes to the last paragraph of Exhibit 10, actually

it is the third to third last paragraph on the second page, which basically says if basic

protocol were followed, the unfortunate outcome could have been prevented." (*Id.* at 11-

12.)

Specifically, the paragraph from Dr. Gross' report to which Mr. Lyle referred

reads as follows:

> I feel that if even a basic emergency room trauma protocol were followed
> in this case, the unfortunate outcome could have been prevented. The
> observation that the bleeding appeared to be slow would have allowed
> adequate time for surgery to have been performed. It appears that a
> number of incorrect assumptions were made by the treating medical staff,
> and the result was, obviously, catastrophic.

(Rep. of Dr. Thomas L. Gross, M.D.)(Def. Trial Ex. 10.) The Court believed, and Mr.

Lyle acknowledged, that Dr. Gross' opinion in that regard referred only to the trauma

protocol at the Alta Vista Regional Hospital and did not pertain to the SMCDC.

However, Mr. Lyle contended that "an expert doesn't put everything in the report,"

(Trial Tr. at 12) and argued that the testimony he sought to elicit from Dr. Gross was

implicit in Dr. Gross' disclosed report.

Counsel for the Board, Mr. Dickman, responded by noting that the primary

reason he had retained Dr. Gross was to rebut the opinions of Bustamante's only

disclosed expert, Dr. Bux, who opined that Avitia's death was attributable to a homicide

by other inmates. Mr. Dickman argued that had he been aware that Bustamante would

seek to elicit testimony beyond the scope of Dr. Gross' disclosed report, Mr. Dickman

would have retained other experts, such as a surgeon, who could have addressed the

16

medical issues raised by such testimony.  Accordingly, Mr. Dickman contended that the proposed scope of Dr. Gross' testimony should have been disclosed during discovery and would constitute unfair surprise if allowed.

One of the primary purposes of discovery is to "make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). Under Fed. R. Civ. P. 26 a party must disclose the identity of its expert witness, Fed. R. Civ. P. 26 (a)(2)(A), and provide to the opposing party a written expert report that contains:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the data or other information considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26 (a)(2)(B).  Additionally, the party is under a continuing duty to supplement the expert's report and deposition testimony, especially where the disclosed information "is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26 (e)(1)-(2).  Under Fed. R. Civ. P. 37 (c)(1), if the party neglects its disclosure obligations under Rule 26, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37 (c)(1).

Bustamante's failure to disclose Dr. Gross' proposed opinion testimony that exceeded the scope of the opinions Dr. Gross rendered in his previous report was neither justified nor harmless. Essentially, Bustamante sought to use Dr. Gross as her own expert in this case without having to comply with the disclosure requirements of Rule 26. The Court disagrees that the testimony Bustamante intended to elicit from Dr. Gross at trial was implicit in his February 9, 2008 report, and finds that the language of that report clearly limited the scope of Dr. Gross' opinion to the conduct of the doctors at Alta Vista Regional Hospital.[9] Accordingly, the Court determined that allowing Dr. Gross to testify as Bustamante proposed would constitute unfair surprise to the Board, and thus granted the Board's motion in limine.[10]

Following the Court's ruling, Bustamante's counsel, Mr. Lyle, stated that in light of the Court's ruling, "[P]laintiff ha[d] no evidence on causation," (Trial Tr. at 19.) and that while Bustamante purportedly could have established negligence by the SMCDC officers, "[sh]e could not establish without Dr. Gross' testimony that the negligence was a cause of Mr. Avitia's death." (*Id.* at 44.) Given Mr. Lyle's concession in this regard, the Court announced it would enter judgment for the Board on Bustamante's remaining claims. However, the Court notes that even if Bustamante had not so conceded, her

---

[9] It is important to note that counsel for both parties met with Dr. Gross off the record and determined that Mr. Dickman and Dr. Gross had never discussed the issue Bustamante sought to raise at trial concerning the point at which Avitia could no longer be saved. (*See* Trial Tr. at 40.)

[10] In light of the Court's ruling, Mr. Lyle requested, and the Court allowed, an opportunity to make a proffer of Dr. Gross' testimony within the bounds prescribed by the Court's ruling on the Board's motion in limine. The Court notes that the proffered testimony would not have changed the Court's analysis of the viability of Bustamante's remaining claims as discussed *infra*.

remaining claims against the Board still would have failed as a matter of law, as discussed below.

**IV.     Defendant's Motion for Summary Judgment (Liability Issues)**

The Board moved for summary judgment on all of Bustamante's claims against it. With respect to Bustamante's claims against the Board under § 1983, the Board argued that "there is not one shred of evidence that the Board's 'policy or custom' or that the Board's specific, identified training deficiency was 'the moving force behind the constitutional deprivation.'" (Mot. Summ. J. Liability at 15.)  To support its argument in that regard, the Board mentioned various training and educational programs the SMCDC had provided its staff members, noted that the SMCDC was well-staffed on the day Avitia died, and argued that SMCDC consistently monitored Avitia throughout his incarceration at the SMCDC. Regarding Bustamante's claim under the NMTCA, the Board crafted its initial arguments based on its understanding that Bustamante brought her NMTCA claim under only NMSA 1978 § 41-4-6 for negligent maintenance and operation of a building.  (*See* Mot. Summ. J. Liability at 19.)  The Board argued that the evidence did not support finding the Board's employees negligent, and further asserted there were no allegedly negligent acts or omissions that created a condition at SMCDC dangerous to the general public.

In response, Bustamante conceded her § 1983 supervisory liability claim against the Board (Doc. No. 43 at 5), but argued that provisions in the NMTCA waive the Board's immunity for vicarious liability for constitutional violations by law enforcement officers it employs.  Specifically, Bustamante focused her arguments on the NMTCA waiver of immunity under NMSA 1978 § 41-4-12 for "law enforcement officers acting

within in the scope of their duties" who commit any of the statutorily enumerated torts or cause a deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico." Bustamante argued that corrections officers at the SMCDC violated Avitia's Eighth Amendment right to be free of cruel and unusual punishment and contended that the Board should be held vicariously liable for that alleged constitutional violation.  At no point in her response did Bustamante address the Board's arguments related to NMSA 1978 § 41-4-6.

The Board, is its reply, argued that Bustamante "ma[de] an argument as to a waiver of immunity that she did not plead . . .," and had never amended her complaint to include such a claim. (Reply at 6)(Doc. No. 45.)  Furthermore, the Board contended that Bustamante had not alleged a violation of any of Avitia's rights under the New Mexico Constitution or any specific New Mexico statute, thus leaving Bustamante's federal constitutional claims as the only legal basis for her NMTCA claim.  As such, the Board asserted that Bustamante's NMTCA claim was "entirely duplicative" of her claims under § 1983.

At the time the Court issued its earlier Memorandum Opinion and Order (Doc. No. 51), the legal issues underlying Bustamante's NMTCA claim had been insufficiently developed and Bustamante's precise theory of liability for that claim was not clear. Accordingly, the Court deferred ruling on that claim and allowed supplemental briefing to address the sole issue of whether Bustamante could assert a vicarious liability claim against the Board under the NMTCA for alleged violations of Avitia's Eighth Amendment rights.  Stated otherwise, the Court intended for the parties to address whether Bustamante could rightfully assert a vicarious liability claim under the NMTCA

20

based on alleged federal constitutional violations that she otherwise would not be able to assert in an action under § 1983.

Once again, in their briefs, the parties to a large extent argued past each other. The Board filed its supplemental brief first and focused its arguments on Bustamante's ability to assert a vicarious liability claim against the Board under NMSA 1978 § 41-4-12, likely in response to Bustamante's emphasis on that claim in her response to the Board's summary judgment motion. In that vein, the Board argued that Bustamante's NMTCA claim was "inconsistent with the same substantive claim under 42 U.S.C. § 1983, and the creation of such a duplicative, inconsistent cause of action under the Tort Claims Act therefore could not have been intended by the legislature." (Supplemental Brief at 1.) Noting that a claim against the Board under § 1983 could not be based on a theory of respondeat superior, *see Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978), the Board contended that by recognizing Bustamante's NMTCA claim the Court "effectively would permit a plaintiff to choose to bring an Eighth Amendment claim, otherwise identical in substance to the same claim under § 1983, but based upon vicarious liability in contravention of long standing U.S. Supreme Court rulings . . .." (*Id.* at 2.)

Bustamante then submitted her supplemental brief in which she neither responded to the Board's arguments nor addressed the issue on which the Court granted supplemental briefing.[11] The Court can only presume that this oversight is attributable

---

[11] In an apparent misunderstanding of the issue to be addressed in the supplemental briefs, Bustamante argued the propriety of bringing a vicarious liability claim under the NMTCA rather than discussing the more nuanced issue of whether a plaintiff can maintain a vicarious liability claim under the NMTCA based on alleged federal constitutional violations when federal law would not otherwise recognize such a claim. (*See* Trial Brief at 1-3.)

to Bustamante's understanding, albeit an erroneous one, that "[t]his Court ha[d] already ruled that Plaintiff's claims against the County are proper with respect to her claims of negligence against the detention officers in the San Miguel County Detention Center under §41-4-12 NMSA 1978."[12] (Trial Brief at 3.) Accordingly, and in an apparent change of course, Bustamante devoted her supplemental brief to arguing the viability of her NMTCA claim under NMSA 1978 § 41-4-6, instead of under NMSA 1978 § 41-4-12

Still unclear about Bustamante's precise theory of liability for her NMTCA claim, the Court sought clarification in that regard on the morning of trial. Initially, the Court explained the basis for its confusion, namely that Bustamante had cited to the entire NMTCA in her complaint rather than naming specific provisions under which she sought to hold the Board liable and the aforementioned vacillation between theories of liability in her various filings. In response, Bustamante acknowledged that she intended to pursue claims under both § 41-4-6 and § 41-4-12. Therefore, the Court will discuss each theory of liability independently.

However, before doing so, a brief discussion of the NMTCA's foundational principles is necessary. At its core, the NMTCA is an enabling statute that serves as a vehicle through which to bring a claim against a governmental entity or employee in New Mexico. *See, e.g.,* NMSA 1978 § 41-4-4 (A). As such, the NMTCA does not itself create an independent cause of action; rather, it waives sovereign immunity for

---

[12] The Court had never so held in this case. In fact, the Court's sole purpose in allowing supplemental briefing was to address whether Bustamante's NMTCA claim, at that time believed to be brought under only NMSA 1978 § 41-4-12, remained viable in light of the Court's other rulings. Hence, Bustamante's claim in this regard is rather perplexing.

governmental entities and governmental employees acting within the scope of their duties for certain torts and constitutional violations.  *Id.*  Hence, neither a governmental entity nor a governmental employee may be held liable for allegedly violating the NMTCA *per se*; instead, any potential liability arises from the alleged commission of one of the enumerated torts or constitutional violations for which immunity has been waived.  *See id.*

A. **Bustamante's Claim under NMSA 1978 § 41-4-6**

With respect to her claim under § 41-4-6, Bustamante argued that the facts of this case are "strikingly similar" to those in *Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, 140 N.M. 205, 141 P.3d 1259, in that the SMCDC allegedly ignored information it received about Avitia's condition from the arresting officer and other inmates and thereby "actively caused" Avitia's death.  Furthermore, Bustamante asserted that the "SMCDC's negligence went far beyond simple failure to monitor the heath [sic] of one of its prisoners. Its employees actively and repeatedly ignored the medical condition of Mr. Avitia when he was brought into the facility . . . then repeatedly ignored desperate attempts by his fellow inmates to gather a bare minimum of help before [Avitia] died . . .." (Trial Brief at 6-7.)  Therefore, Bustamante contended, the SMCDC's conduct in this case extended beyond a single act of negligence and instead evidenced a broader systemic failure to follow safety protocols, which provides a sufficient basis for a cognizable claim under § 41-4-6.

NMSA 1978 § 41-4-6 provides in relevant part that:

The immunity granted pursuant to [NMSA 1978 § 41-4-6 (A)] does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while

23

> acting within the scope of their duties in the operation or maintenance of
> any building, public park, machinery, equipment or furnishings.

NMSA 1978 § 41-4-6 (A).  For this waiver of immunity to apply, "the negligent

'operation or maintenance' must create a dangerous condition that threatens the general

public or a class of users of the building."  *Upton*, 2006-NMSC-040, ¶ 8.  Although

§ 41-4-6 has been interpreted broadly, *Upton*, 2006-NMSC-040, ¶ 9, that interpretation

has not been without limits.

For instance, in *Archibeque v. Moya*, 116 N.M. 616, 866 P.2d 344 (1993), the New

Mexico Supreme Court rejected a claim under § 41-4-6 by an inmate who had been

assaulted in prison by one of his known enemies after a prison intake officer negligently

failed to check whether any of the inmate's known enemies were in the general prison

population.  The Court concluded that the prison intake officer's negligent classification

decision did not constitute operation or maintenance of the prison but rather amounted

to an administrative decision for which immunity is not waived under § 41-4-6.  In so

holding, the Court noted that:

> [r]eading Section 41-4-6 to waive immunity every time a public employee's
> negligence creates a risk of harm for a single individual would subvert the
> purpose of the Tort Claims Act, which recognizes that government, acting
> for the public good, should not have the duty to do everything that might
> be done, and limits government liability accordingly."

*Id.*, 116 N.M. at 620, 866 P.2d at 349.

Likewise, the New Mexico Supreme Court has limited the scope of claims under

§ 41-4-6 by prohibiting claims based solely on a theory of negligent supervision.  *See*

*Espinoza v. Town of Taos*, 120 N.M. 680, 683-84, 905 P.2d 718, 721-22 (1995).  In

*Espinoza*, the New Mexico Supreme Court rejected a § 41-4-6 claim brought on behalf of

a child who was injured after falling from a slide while attending a city-run day camp program because the only basis for the claim was the allegedly inadequate number of day camp personnel and the purported negligence of day camp personnel in supervising the injured child.  As such, the Court found that the child's parents had alleged nothing more than negligent supervision, a cause of action to which the NMTCA's limited waiver of immunity did not apply.  *Id.*

However, under a significantly different factual backdrop, the New Mexico Supreme Court found that the parents of a child who died from an asthma attack after a substitute physical education teacher required the child to participate in a rigorous class session despite the child's requests to be excused had stated a cognizable claim under § 41-4-6.  *Upton*, 2006-NMSC-040, ¶¶ 1-3, 25.  The Court in *Upton* concluded that the parents "clearly assert[ed] much more than negligent supervision of their daughter" and instead had "challenge[d] the School District's general failure to implement promised safety policies for at-risk students."  *Id.* ¶ 18.  In distinguishing the case from *Archibeque* and *Espinoza*, the Court noted that had the only alleged misconduct been the substitute teacher's failure to monitor the child during the rigorous exercise, the claim would have been "much closer" to the single administrative decision in *Archibeque* and "nearly identical" to the negligent supervision claim in *Espinoza*. *Upton*, 2006-NMSC-040, ¶ 21. However, the Court elaborated on the facts of the case, explaining that:

> The school failed to implement [the child]'s IEP, to respond appropriately to the specific information it was given about [the child]'s condition, and to implement the specific assurances given to the [parents] about the care the school was to provide in light of [the child]'s special needs. The substitute teacher, a school employee, forced [the child] to continue her exercise despite tangible evidence of her distress. Then, the school failed to properly implement its emergency procedures. Faced with [the child]'s

> acute distress, the school never administered CPR, no one called 911 in a
> timely manner, [the child] was simply wheeled outside to await emergency
> personnel. Thus, the [parents] challenge far more than a single failure of
> oversight by one overworked teacher.

*Id.* ¶ 18. Thus, it was the school's failure to act and implement adequate safeguards in
light of the special knowledge it had of the child's medical condition and not the isolated
incident of the child's asthma attack that ultimately supported the Court finding that the
parents had stated a claim sufficient to waive immunity under § 41-4-6.

Following the New Mexico Supreme Court's decision in *Upton*, the New Mexico
Court of Appeals applied the teachings of *Upton* to a case that is instructive for purposes
of the current discussion.  In *Lessen v. City of Albuquerque,* 2008-NMCA-085, 144 N.M.
314, 187 P.3d 179 the court considered *inter alia* a § 41-4-6 claim brought on behalf of a
an inmate who died from hypothermia following his release from the county detention
center.  There, the detention center maintained a policy of requiring any inmate released
from the facility to take a transportation van to a designated drop-off location unless the
inmate had arranged for alternate transportation and had provided the detention center
with a signed waiver.  The detention center in that case released four inmates including
the plaintiff's deceased, who was exhibiting signs of heroin withdrawal at the time, to
the detention center parking lot despite only one of those inmates presenting a signed
waiver.  The plaintiff's deceased did not present a signed waiver and, according to the
subsequent investigation, following his release wandered away from the parking lot, fell
from a ditch bank and died where he landed.

The plaintiff in *Lessen*, like Bustamante, relied heavily on *Upton* to support her
§ 41-4-6 claim, arguing that "the City's failure to ensure proper transportation for all

released inmates and its failure to attend to inmates' medical needs are analogous to the school district's omissions in *Upton*." *Lessen*, 2008-NMCA-085, ¶ 24.  In rejecting the plaintiff's arguments, the Court of Appeals noted that the plaintiff had not identified "the danger to which [the detention center's] employees' acts or omissions exposed released inmates," and further observed that the evidence established that the other released inmates had walked to a nearby gas station and used the phone to arrange for a ride.  Additionally, the court found that the plaintiff's claims were directed specifically at the treatment of the plaintiff's deceased, pointing out that plaintiff had alleged that the detention center should have known that the plaintiff's deceased was coming out of detoxification and may have been disoriented and therefore should have taken extra steps to protect him.  The nature of the plaintiff's claims coupled with the evidence presented, led the court to conclude that the case was more analogous to *Espinoza* than to *Upton* and thus that plaintiff had failed to state a claim for which immunity had been waived under § 41-4-6.

   Although Bustamante attempts to characterize the circumstances preceding Avitia's death as similar to those preceding the child's death in *Upton*, the evidence in the record does not support such a characterization.  First, SMCDC maintained a policy of requiring all inmates who had been referred to a hospital immediately preceding their arrival to obtain a medical clearance before being admitted to the SMCDC.  (Mot. Summ. J. Liability, Exs. A ¶ 8; B ¶ 5.)  It is undisputed that Avitia obtained such a clearance before arriving at the SMCDC. (Pl's Trial Ex. 1-9; Def's Trial Ex. 4.)  SMCDC also conducted its own medical assessment as part of the intake and booking process. (*Id.*, Ex. 4-2.)  However, due to Avitia's level of intoxication at the time of his arrival,

that medical assessment did not occur until the following day after Avitia had time to become sober.  (*Id.*, Exs. 4-2, 4-4.)  According to the time line created by the SMCDC and submitted by Bustamante as a trial exhibit, SMCDC staff monitored Avitia throughout the time he was "sobering up" and provided him with food, juice and water. (*Id.*, Ex. 4-2.)  Once Avitia finally underwent a medical assessment at the SMCDC, the nurse doing the evaluation did not note any medical issues or abnormalities. (*Id.*, Ex. 2-1.)

Avitia completed the SMCDC medical assessment some time after 12:30 p.m. and was moved to the multi-occupant holding cell at 2:00 p.m.  SMCDC staff then checked on the inmates in the holding cell at 4:00 p.m. and noted that Avitia "appear[ed] to be fine." (*Id.*, Ex. 4-2.)  It was only shortly after 5:00 p.m. that SMCDC staff found Avitia non-responsive.

Under that set of facts, derived almost entirely from Bustamante's own trial exhibits, nothing suggests the kind of ongoing neglect and failure to act in the face of known danger that was present in *Upton*.  While Bustamante submitted trial depositions of Patrick Daniel Maes and Akeen Birdow as evidence of the SMCDC's alleged neglect of Avitia and his fellow inmates' calls for help, viewed in conjunction with the aforementioned facts, those depositions at most support a claim for negligent supervision.  For example, Akeen Birdow, another inmate in the holding cell, testified as follows:

> Q.  So [Avitia] was unsteady, he couldn't hold his water,
> he was really thirsty, you guys got him water, and then
>  somewhere around an hour, hour and a half later you
> started banging on the door, correct?

A.  Yes.

Q.  And that's when the guard came -- did the guard
actually come in, or did he just go to the window?

A.  He came to the window and I talked to him -- no,
he came to the door and I talked to him through the crack, because it's like
a tight cell, you know what I mean?  So you can't really hear the person
outside of the cell.  It's a lot of activity going on in the booking area, so you
have to talk through the crack of the door. I told the man that he was sick,
you know what I mean?  I was like, "We all need to do something," you
know what I mean? And then the officer, he acted kind of sarcastic, like,
"Well, no.  He just has -- he's like a barracho," you know what I mean?
"He's an alcoholic.  He just  needs to sleep it off.  He'll be fine."

. . .

Q.  Did you do anything after that to try to get help for Mr. Avitia?

A.  Like several times, because it got to a point to where -- like he would get up
and, like, he would start pouring water on himself, you know what I mean?
Like he was hot, you know what I mean?  He drenched himself with water
a couple of times.  And he would go back and lay back down, you know
what I mean?  And then another time he'll start shivering, so he'd cover
himself up. And, I mean, I don't know how he died but, you know what I
mean, you know, whatever way he died and whatever it says on the
autopsy report or whatever, you can tell that this man was sick.  And we
just would not let a man like that suffer in our cell.

Q.  How many times did you try to get the guards to come to the door?

A.  Four, maybe five times.

(Birdow Dep. 15:5-25, 16:8-24.)  Even accepting as true the entirety of Birdow's

testimony, it still does not controvert the fact that Avitia received two medical

clearances before entering that holding cell.  Thus, at most, Bustamante could establish

that SMCDC staff neglected to investigate Avitia's medical condition in response to the

other inmates' requests to do so for a period of three hours.  However, Bustamante's

own evidence contradicts any such conclusion because, as discussed above, the record

indicates that SMCDC staff looked in on Avitia at 4:00 p.m., two hours after placing him

in the holding cell.

In contrast to *Upton* where the school's negligence spanned a considerable period of time, included several different actors, and constituted a systemic failure that raised grave concerns for the safety of other children in the school, the facts underlying Bustamante's claim simply do not suggest such a broad pattern of negligence or a threat to the safety of other SMCDC inmates.  Instead, Bustamante's claims are more analogous to those in *Lessen* and *Espinoza* in that Bustamante has focused her allegations on the purported mistreatment of Avitia and the lack of adequate supervision of *his* condition as opposed to alleging, or in any way demonstrating, an ongoing pattern or policy of neglecting inmates' medical needs. In short, Bustamante has failed to demonstrate that any conduct or omission by the SMCDC created a condition dangerous to the SMCDC inmate population as a whole.  Accordingly, the Court finds that Bustamante has failed to state or establish by evidence a cognizable claim under § 41-4-6 and that judgment should be entered in favor of the Board on this claim as a matter of law.

**B.      Bustamante's Claim under NMSA 1978 § 41-4-12**

With regard to her claim under § 41-4-12, Bustamante argued that unnamed SMCDC officers violated Avitia's Eighth Amendment rights[13] and that the Board, as the supervisory entity, should be held vicariously liable for those alleged constitutional violations.  Importantly, Bustamante did not allege either in her complaint or in any

---

[13] As noted by Bustamante, Fourteenth Amendment due process extends that right to state prisoners detained before trial. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

subsequent briefing that the SMCDC officers violated any provision of the New Mexico

Constitution or any New Mexico statute apart from the NMTCA.

NMSA 1978 § 41-4-12 addresses the limited waiver of immunity for law

enforcement officers and provides that:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA
> 1978 does not apply to liability for personal injury, bodily injury, wrongful
> death or property damage resulting from assault, battery, false
> imprisonment, false arrest, malicious prosecution, abuse of process, libel,
> slander, defamation of character, violation of property rights or
> deprivation of any rights, privileges or immunities secured by the
> constitution and laws of the United States or New Mexico when caused by
> law enforcement officers while acting within the scope of their duties.

For purposes of § 41-4-12, corrections officers are generally considered law enforcement

officers. *See Abalos v. Bernalillo County Dist. Atty's Office*, 105 N.M. 554, 559-60, 734

P.2d 794, 799-800 (Ct. App. 1987).  Additionally, mere negligence is not actionable

under § 41-4-12 unless such negligence leads a third party to commit one of the

enumerated torts. *Blea v. City of Española*, 117 N.M. 217, 219-20, 870 P.2d 755, 757-58

(Ct. App. 1994).

In certain circumstances, the NMTCA provides for vicarious liability of a

governmental entity with supervisory authority over an individual governmental

employee.  Specifically, as the *Abalos* Court explained,

> To name a particular entity in an action under the Tort Claims Act requires
> two things: (1) a negligent public employee who meets one of the waiver
> exceptions under Sections 41-4-5 to -12; and (2) an entity that has
> immediate supervisory responsibilities over the employee. If a public
> employee meets an exception to immunity, then the particular entity that
> supervises the employee can be named as a defendant in an action under
> the Tort Claims Act.

*Abalos*, 105 N.M. at 559, 734 P.2d at 799.

31

Bustamante's reliance on that portion of the *Abalos* decision as support for the viability of her remaining claims against the Board is misplaced.  As that standard makes clear, one of the foundational requirements of a vicarious liability claim is the existence of a public employee who meets an exception to immunity — no such person exists in this case.  As discussed in Part I *supra*, Bustamante did not specifically name any individual defendants and all unnamed defendants have been dismissed.  Hence, there is no individual misconduct for which the Board could be held vicariously liable.

However, even if the individual defendants were parties in this case, Bustamante's § 41-4-12 vicarious liability claim against the Board would still fail.  While the Board contends that this would be so because Bustamante's claim would automatically duplicate her § 1983 claim, that is not necessarily the case.  The New Mexico Supreme Court has explicitly held that a plaintiff is not prohibited from bringing a claim under both § 1983 and the NMTCA against the same entity or employee for the same conduct or series of events.  *Wells v. County of Valencia*, 98 N.M. 3, 5, 644 P.2d 517, 519 (1982).  In so holding, the *Wells* Court observed that:

> The federal remedy for damages arising out of a constitutional violation by a person acting under color of state law is 42 U.S.C. § 1983. However, Section 1983 is only intended to compensate for injuries caused by the deprivation of a constitutional right, *Carey v. Piphus*, 435 U.S. 247, 98 S. Ct. 1042, 55 L.Ed.2d 252 (1978); it is not intended to be a remedy for tortious conduct, *Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908, 68 L.Ed.2d 420 (1981). It is recognized that a Section 1983 action is a species of tort liability, and that the common law of tort damages will be a starting point for Section 1983 damages; however, common law tort rules may not provide a complete solution in every Section 1983 case. *Carey v. Piphus*, *supra*. Not all tortious conduct amounts to a constitutional deprivation. *Id.*; *Parratt v. Taylor*, *supra*; *Fearon v. Commonwealth of Virginia*, 383 F.Supp. 542 (W.D.Va.1974). As more particularly applied to this case, not all tortious conduct subject to liability under state law amounts to "cruel and unusual punishment" in violation of U.S. Const. amend. VIII, which is

> subject to liability under Section 1983. *See Howell v. Cataldi*, 464 F.2d 272
> (3d Cir. 1972). There must be a "deliberate indifference to a prisoner's
> serious illness or injury" on the part of a governmental entity to constitute
> a form of cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97,
> 105, 97 S. Ct. 285, 291, 50 L.Ed.2d 251 (1976).

*Wells*, 98 N.M. at 5-6, 644 P.2d at 519-20.

While at first blush this language would seemingly salvage Bustamante's

§ 41-4-12 vicarious liability claim, it does not because of Bustamante's failure to plead

any state cause of action.  Bustamante has articulated as the basis for her    § 41-4-12

vicarious liability claim against the Board the alleged violation of Avitia's Federal

Constitutional Eighth Amendment rights by unnamed SMCDC corrections officers. (*See*

Doc. No. 43 at 7-8.)  Although she has also made passing references to "actionable

negligence" by the SMCDC corrections officers, she has not articulated any facts that

would suggest the alleged negligence of those officers led a third party to commit a tort

for which immunity has been waived.  Thus, such "actionable negligence" could not

form the basis of Bustamante's vicarious liability claim in this case and she is left with

only the Eighth Amendment claim as a possible ground for that claim.  By using the

alleged violation of Avitia's Eighth Amendment rights as the basis for a vicarious liability

claim against the Board under the NMTCA, Bustamante is attempting to use state law to

pursue a federal claim that federal law would not allow.  The NMTCA cannot be read to

permit such a claim.

"[W]hen state law creates a cause of action, the State is free to define the

defenses to that claim, including the defense of immunity, unless, of course, the state

rule is in conflict with federal law." *Ferri v. Ackerman*,  444 U.S. 193, 198 (1979)(citing

U.S. Const., Art. VI, cl. 2).  Likewise, "[w]hen federal law is the source of the plaintiff's

claim, there is a federal interest in defining the defenses to that claim, including the defense of immunity." *Id.*, 444 U.S. at 198 n. 13; *see also Howlett v. Rose*, 496 U.S. 356, 375 (1990)(holding that federal law defines the elements of and defenses to a federal cause of action).  Unquestionably, Bustamante's claim alleging violation of Avitia's rights under the Eighth Amendment to the United States Constitution derives from federal law even though she is using that claim as the basis for asserting vicarious liability under a state enabling statute.

Although 42 U.S.C. § 1988 "authorize[s]  federal courts, where federal law is unsuited or insufficient to furnish suitable remedies to look to principles of the common law, as altered by state law," it does not so permit where "such principles are [] inconsistent with the Constitution and laws of the United States." *Moor v. Alameda County*, 411 U.S. 693, 703 (1973), overruled on other grounds by *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978).  Furthermore, that section was not "meant to authorize the wholesale importation into federal law of state causes of action — not even one purportedly designed for the protection of federal civil rights." *Id.*, 411 U.S. at 704.  Thus, it is clear that the reach of § 1988 is carefully circumscribed by an overarching desire to promote adherence to previously defined federal law and the United States Constitution.

In this case, to accept Bustamante's § 41-4-12 claim as viable, the Court would be forced to effect a wholesale importation of the NMTCA and its governing principles into the federal law governing her Eighth Amendment claim.  It is well settled that claims of federal constitutional violations under § 1983 may not be based on a theory of respondeat superior. *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978). Accordingly,

34

recognizing such a claim would require a court to contravene established United States Supreme Court precedent or effect a wholesale importation of a state cause of action that permitted the claim in violation of the recognized limits of § 1983. Of course, neither option is practicable and the Court has not found any other decisions that have opted to expand municipal liability in such a way.

To the contrary, the United States Court of Appeals for the Second Circuit in considering a scenario similar to the one presented here held that:

> Just as states cannot extinguish municipality liability under § 1983 via state law, they cannot enlarge it either. As the Supreme Court discussed in Monell, Congress chose not to impose a federal law of respondeat superior, in part because it believed the imposition of an obligation on municipalities to keep the peace would raise constitutional problems. A state may not alter that choice. If [a state] wishes to confer a cause of action against municipalities that is more generous to plaintiffs than § 1983, it is free to do so, but it may not tinker with the boundaries of the cause of action created by federal statute.

*Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005). Similarly, a much earlier decision from the United States Court of Appeals for the Eighth Circuit found that "the measure, scope, and application of an asserted immunity under § 1983, arising, as it does, under a federally created cause of action, cannot be restricted or enlarged by state laws concerning official privilege or immunity." *Bell v. Wolff*, 496 F.2d 1252, 1253 (8th Cir. 1974)(cited with approval in *Palmer v. City of Monticello*, 31 F.3d 1499, 1504 n. 5 (10th Cir. 1994)). Thus, the relevant authority weighs strongly against recognizing a claim, like Bustamante's, that seeks to enlarge the traditional scope of municipal liability under federal law via importation of state common law principles. The Court, therefore, declines to allow Bustamante to sidestep the established limits of federal law through creative use of the NMTCA.

Hence, the Court finds that Bustamante has failed to state or prove a cognizable claim for vicarious liability against the Board under § 41-4-12 and that judgment should be entered in favor of the Board on this claim as a matter of law.

## CONCLUSION

The proposed testimony Bustamante sought to elicit from Dr. Gross exceeded the scope of his Rule 26 disclosures, and, thus, would have constituted unfair surprise to the Board.  Each of Bustamante's claims against the Board asserted under the NMTCA fails as a matter of law.

**IT IS THEREFORE ORDERED THAT:**

1) Plaintiff Ramona Bustamante's Motion to Substitute John and Jane Doe Defendants (Doc. No. 44) is DENIED;

2) Defendant Board of County Commissioners of San Miguel County's Defendant's Motion for Summary Judgment (Based on Plaintiff's Standing) (Doc. No. 38) is GRANTED to the extent that Bustamante has conceded she is not validly the personal representative of Avitia's estate and thus lacks a cause of action under § 1983 against the John and Jane Doe Defendants;

3) Defendant Board of County Commissioners of San Miguel County's Defendant's Motion for Summary Judgment (Liability Issues) (Doc. No. 37) is GRANTED;

4) Defendant's Motion in Limine (Doc. No. 68) is GRANTED;

5) All of Bustamante's claims will be dismissed by a separate Judgment.

_____
SENIOR UNITED STATES DISTRICT JUDGE